IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 05, 2014[1]

**IN RE JAYDEN G.**

**Appeal from the Juvenile Court for Hardin County**
**No. 12JV1035      Daniel L. Smith, Judge**

---

**No. W2014-00881-COA-R3-PT - Filed September 30, 2014**

---

In this termination of parental rights case,  Mother appeals not only the  trial court's findings of severe child abuse and persistent conditions as the grounds for termination, but also the trial court's conclusion that termination was in the child's best interest.  We affirm the trial court's finding of severe abuse, but  reverse the trial court's finding that clear and convincing evidence exists to prove the persistence of conditions. We also affirm the trial court's finding that termination is in the child's best interest, and therefore, affirm the termination of the Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Joe L. Brown, Savannah, Tennessee, for the appellant, Morgan G.

Robert E. Cooper, Jr., Attorney General and Reporter; Jason L. Coleman, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I.  Background**

---

[1] This case was originally  assigned on  August 5, 2014 to  a panel  consisting  of  Judge David R. Farmer, Judge Holly M. Kirby, and  Judge J. Steven Stafford.  It was reassigned on September 2, 2014 to its current panel.

The minor child, Jayden G., was born in December 2011 to Respondent/Appellant Morgan G. ("Mother," or "Appellant") and Antwan P. ("Father").[2]  The State of Tennessee Department of Children's Services ("DCS," or "Appellee") first became involved with the child on September 4, 2012 when it removed the child from his parents' home.

Upon receiving a report that the child's parents used illegal drugs, including methamphetamine, a DCS investigator met with the parents. Immediately after the child's removal, DCS performed drug screens on Mother and Father. Mother tested positive for benzodiazepines,[3] marijuana, and methamphetamine. Father's drug screen was negative; however, Mother testified that Father also had used methamphetamine four days prior to the drug screen. DCS attempted to retest Father, but Father refused to take a hair follicle drug test until September 19, 2012. On September 7, 2012, a hair follicle drug test was performed on the child; the child, then eight months old, tested positive for methamphetamine, benzoylecgonine,[4] and cocaine. DCS filed a dependency and neglect petition on September 10, 2012, citing severe child abuse as the ground. On September 19, 2012, Father tested positive for amphetamine, methamphetamine, benzoylecgonine, and cocaine. Mother admitted that she and Father used methamphetamine in the bathroom of the house and in the room where the child slept. She also testified that her mother ("Maternal Grandmother") and Maternal Grandmother's boyfriend had possessed cocaine in the same home.

Lisa Piercey, M.D., performed a medical assessment of the child.[5] At trial, she testified that she assessed the child as being a victim of severe physical abuse, drug exposure, and drug endangerment. Dr. Piercey opined that exposure to the manufacture of methamphetamine would have been life threatening in the short term, and direct exposure to the use and/or manufacture of methamphetamine and/or cocaine may cause long-term impairment of

---

[2]In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[3]The benzodiazepines are a class of drugs that generally share a basic chemical structure. Flem K. Whited, Drinking/Driving Litigation: Criminal & Civil §16:16 (2d ed. 2014). Benzodiazepine effects may include sedation, hypnosis, decreased anxiety, muscle relaxation, and anticonvulsant activity. *Id.* (citing S.C. Harvey, Hypnotics & Sedatives, Goodman & Gilman's The Pharmacological Basis of Therapeutics 339 (6th ed. 1980). A commonly known benzodiazepine is Valium.

[4]Benzoylecgonine is the primary metabolite of cocaine. McGraw-Hill Concise Dictionary of Modern Medicine 54 (1st ed. 1992).

[5]The record does not indicate Dr. Piercey's specific field of medicine. It is undisputed that she was qualified to diagnose the child, as well as give her opinion regarding the effect of drug exposure on the child.

neurological, behavioral, respiratory, and other organ development.

After removing the child from his parents' home, DCS initially placed the child in the home of his maternal great-grandparents. Soon thereafter, however, the child's great-grandparents indicated that they could no longer care for the child due to health reasons.

Consequently, the trial court placed the child into the custody of DCS on November 27, 2012, adjudicating him to be a dependent and neglected child. The trial court found that the parents knew of the minor child's exposure to illegal drugs or were in deliberate ignorance or reckless disregard of the harm to the child by the drug exposure. Since the trial court's November 27, 2012 order, the child has continuously remained in DCS custody.

DCS allowed Mother and Father to have supervised visitation with the child through Wolfe Counseling, paid for in-home services to be provided by Wolfe Counseling, and provided random drug screens. On January 24, 2013, Mother completed an Alcohol and Drug Assessment with Wolfe Counseling.[6] The counselor made seven recommendations:

> 1. [Mother] should follow all directives of the court and DCS regarding [the child].
> 2. [Mother] should attend weekly outpatient therapy sessions every other week for at least six months.
> 3. [Mother] should attend therapeutic group sessions if there is a treatment center where therapeutic groups are conducted. These therapeutic group sessions should not be confused with AA/NA [i.e., Alcoholics Anonymous/Narcotics Anonymous] support groups.
> 4. [Mother] should attend at least 3 AA/NA support group sessions with written verification of each group attendance. This should be given to the case manager to provide proof to the court that she is attending these support group sessions as recommended.[7]

---

[6]Although the Alcohol and Drug Assessment is in the record, there appears to be no court order in the record that orders Mother to complete the assessment or attend any sort of therapy. This Court infers that such an order existed as part of the original dependency and neglect action. Neither party has raised this as an issue.

[7] In the trial court's later order removing the child from Mother's custody, the trial court characterizes this recommendation as requiring Mother to "attend at least three Alcoholic Anonymous/Narcotics Anonymous Support Groups per week[.]" The plain language of the recommendation

(Continued....)

5. [Mother] will pass random drug screens for at least a six month period.

6. At the end of six months, [Mother] should be assessed by her A and D counselor to determine where [Mother] is in therapy and if she needs to continue with the individual therapy and therapeutic group sessions. She should follow all recommendations of her counselor regarding continued substance abuse therapy.

7. Due to the fact that [the child] tested positive for drugs which lead [sic] to his removal from his mom's custody, mom should continue to receive supervised visits with [the child] until she has successfully completed all recommendations of this counselor in this assessment. The supervision can be therapeutic or conducted by someone approved by DCS to provide this supervision.

In March 2013, six months after the removal of the child, Father was arrested on charges involving a gun, drug paraphernalia, and possession of the ingredients used to make methamphetamine. The arrest took place in front of Mother's residence. One of the charges involved a bottle as evidence, which bottle was found in Mother's car.[8] During the later trial in this cause, Father's counsel stated that Father pleaded guilty to both a drug paraphernalia charge and a gun charge, as well as to a charge involving the possession of materials required to manufacture methamphetamine. As a result of Father's guilty pleas, he was ordered to undergo treatment at a rehabilitation center. However, Father was discharged from the center without completing the program due to possession of drug paraphernalia. He later checked himself back into the Hardin County Jail. Although he was incarcerated at the time of the trial on this matter, Father attended and testified.

The trial court entered a final order on the disposition of the child on February 14,

_____

(...continued)
only appears to require Mother to attend three meetings, rather than three meetings per week. It is undisputed that Mother attended two meetings per week throughout the pendency of these proceedings.

[8]The record is unclear what the bottle was used for; however, in light of Father's charges and his testimony at trial, we believe it reasonable to assume that the bottle was confiscated as drug paraphernalia. At trial, Father testified that he had put something in the empty Dr. Pepper bottle, but he could not remember the ingredients. When asked whether the ingredients could be used to make a drug, Father responded, "It might have been." Further, during the testimony of Andrea White, a Family Service Worker from DCS, counsel for Mother indicated that Father had been "busted for shake and bake." "Shake and bake" is a common method of methamphetamine manufacture wherein "all of the ingredients needed to manufacture methamphetamine would be placed in a two-liter bottle." *State v. Robertson*, No. M2011-00868-CCA-R3-CD, 2013 WL 59372, at *2 (Tenn. Crim. App. Jan. 7, 2013).

2013. In the order, the trial court found that the child was a victim of severe child abuse, and therefore, dependent and neglected. Neither Mother nor Father appealed the trial court's order or its finding of severe child abuse. After a finding of severe abuse by the trial court in the dependency and neglect action, DCS filed a motion to be relieved of making reasonable efforts toward reunification. The trial court granted this motion on July 18, 2013.

Six months after the finding of severe child abuse, on August 14, 2013, DCS filed a Petition for Termination of Parental Rights against Mother and Father, which petition was heard on March 14, 2014. The trial court heard testimony from Mother, Father, several representatives from DCS, the foster family, and several of Mother and Father's relatives.

Testimony shows that the child has lived in the home of Scott M. ("Foster Father") and Jennifer M. ("Foster Mother," and together with Foster Father, "Foster Parents") while in the custody of DCS. At trial, Foster Father testified that he is the executive pastor at a church, and Foster Mother is also employed by the church as the worship pastor. Foster Parents testified they are able to take care of the child financially, educationally, developmentally, and spiritually. Foster Parents have resided in the same home since the child has been placed with them. The child has his own bed in his own room, and he acknowledges that these items belong to him. Testimony also indicated that the child "loves" the "routine" of having regular seats at dinnertime and also enjoys riding in the car. Foster Father further testified that he and his wife have attempted to maintain the relationship between the child and his biological parents. For example, Foster Father testified that they even returned early from a family Christmas visit to Wisconsin so that the child could attend the first birthday party his biological family had planned in Tennessee. In their testimony, Foster Parents have indicated their desire to adopt the child.

Multiple witnesses testified to the strong bond that the child has formed with Foster Parents. The child calls Foster Parents "[m]amma and dadda." At trial, Foster Father explained in his testimony how the child has blended very well with their extended family. In her testimony, Mother, too, admitted that the child seems to be bonded with his foster family. Another witness, a friend of Foster Parents, described the child as "just a very happy, happy child with them."

Mother testified regarding the positive life changes she has made since the child was removed from her custody. First, Mother obtained stable employment working approximately forty hours per week. Mother testified at trial that she attended Narcotics Anonymous/Alcoholics Anonymous meetings twice per week at the recommendation of Mother's Drug and Alcohol Assessment counselor and has even chaired a meeting. Since the child was removed from her home, Mother has passed every subsequent drug test. Although the counselor also recommended that she attend bi-weekly outpatient therapy

sessions for six months, Mother admits she has not fulfilled this recommendation because she "[doesn't] know where any are." Mother did, however, attend therapeutic group sessions at a treatment center, which fulfilled another recommendation of the counselor.

Mother also testified that she and Father are no longer in a relationship. On cross-examination, however, Mother conceded that she had indicated on social media that she and Father had an ongoing relationship, including calling Father her "Man Crush Monday" and her "hubby." Mother also posted pictures displaying alcohol on social media during the time-frame she was attending Alcoholics Anonymous and as late as one week before trial. Mother contended that, although she posted pictures of her purported relationship and alcohol use on social media, these photographs did not represent her current lifestyle. She testified that she posted these pictures because she "live[s] a fake life. I don't know why I put stupid things up there, to make other people think I'm somebody I'm not. I live a fake life." Notably, Mother posted a photograph with Father indicating they were still in a relationship even after Father had been arrested on drug-related charges in March 2013. Mother testified that her photographs with Father were not actually from the date they were time stamped online. Mother conceded that she lied on social media, including posting pictures of alcohol use online to perpetuate the "fake life" she wanted to display to people.

Mother testified that she was compliant in all of the court orders regarding the payment of child support and insurance for the benefit of her child. Indeed, the record shows that Mother's child support and insurance payments for the benefit of the child equaled approximately half of her monthly income. During trial, Mother indicated that she could support the child on $200.00 per month and fulfill all of his needs. Mother is a full-time employee. At the time of trial, Mother's bi-weekly take-home pay was $248.12, with $103.84 being withheld for child support and $178.00 for insurance. Of the $178.00 insurance payment, approximately $100.00 covers the child's insurance. Foster Mother indicated during her testimony that the foster family receives a stipend of approximately $250.00 per month to cover the child's expenses, and they must supplement it with their own funds to provide for the child's needs that the stipend does not cover, including special medical expenses required by the child.[9]

In addition to providing insurance and paying child support, Mother visits with the child every other week for two hours, typically at Foster Parents' church or at a restaurant. Mother has attended every scheduled visitation. However, testimony shows that the child has recently started calling Mother by her first name and confusing Mother with a woman in a home video at Foster Parents' home. Mother indicated, however, that she has changed the

---

[9]Testimony indicates that the child sees a specialist at Le Bonheur Children's Hospital for breathing problems.

child's diaper during visitation and that he walks to her when he sees her.

Since the child has been in the custody of the State, Mother has moved approximately four times, living both alone and with relatives. Most recently, Mother testified that she has been residing with her uncle.

After the trial on the petition to terminate Mother and Father's parental rights, the trial court terminated both parents' parental rights by order of April 17, 2014. The trial court found two grounds for termination as to both Mother and Father: (1) severe child abuse; and (2) persistence of conditions.[10] The trial court also found that it was in the best interests of the child for both parents' rights to be terminated. From this order, Mother now appeals.

## II. Issues Presented

Mother raises two issues for review in her appellate brief:

> 1. Whether the trial court erred in finding clear and convincing evidence to support the ruling that grounds existed to terminate the Mother's parental rights.
> 2. Whether the trial court erred in finding that the termination of Mother's parental rights was in the best interests of the child.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

---

[10]In this order, Father's parental rights to the child were terminated as well. Father did not appeal. Accordingly, Mother is the sole appellant in this case.

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

### IV. Grounds for Termination of Mother's Parental Rights

The trial court found two grounds for terminating Mother's parental rights. Only one ground must be proved by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c). After reviewing the entire record in this case, we conclude that the ground of severe child abuse is established by clear and convincing evidence. However, we have determined that the trial court erred in finding that clear and convincing evidence establishes the ground of persistence of conditions. We begin first with the trial court's finding of severe abuse.

### A. Tennessee Code Annotated Section 36-1-113(g)(4): Severe Child Abuse

In Tennessee, a court may terminate parental rights when:

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as:

The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

Tenn. Code Ann. § 37-1-102(b)(21)(A)(i). A finding of "severe child abuse" in the underlying dependency and neglect action serves two purposes. First, the finding of "severe child abuse" constitutes an independent ground for the termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(4). Second, a finding of "severe child abuse," even if made during a dependency and neglect action, relieves DCS of its obligation to preserve and reunify the child with the parents. Tenn. Code Ann. § 37-1-166(g)(4)(A).

In its order dated February 14, 2013, the trial court found that the child suffered severe child abuse as defined by Tennessee Code Annotated Section 37-1-102(21) perpetuated by Mother and Father. The order provides that it is a final order regarding the disposition of the child as dependent and neglected on the ground of severe child abuse. Mother did not appeal the final disposition or the finding of severe abuse. It is well-settled that a court may apply "the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). Thus, where a parent "had a full and fair opportunity to litigate th[e] issue [of severe abuse] in the prior suit" and "chose not to appeal the court's order in the prior action," the finding of severe abuse is "a final decision, which the [parent] is barred from challenging." *State Dep't of Human Servs. v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. App. March 31, 1995). Because Mother did not appeal the trial court's finding of severe child abuse within the time allowed by law, the order became a final order and *res judicata*. Thus, the trial court did not err in finding that Mother has committed severe abuse for purposes of termination of her parental rights.

**B. Tennessee Code Annotated Section 36-1-113(g)(3): Persistence of Conditions**

Although only one ground must be proven by clear and convincing evidence to justify termination, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each ground for termination, in order to avoid unnecessary remand. *See In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Thus, we next consider the issue raised by Mother regarding the trial court's finding of persistence of conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g).[11]

"A parent's continued inability to provide fundamental care to a child, even if not wilful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct.

---

[11]We note that termination on the ground of persistence of conditions implicates DCS's obligation to demonstrate that it made reasonable efforts to reunite the child and parents. *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, n.27 (Tenn. Ct. App. Mar. 9, 2004). When DCS's obligation to make reasonable efforts is implicated, DCS must prove by clear and convincing evidence that it made reasonable efforts. *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). On April 1, 2013, DCS requested relief from making reasonable efforts. Because both parents were found to have committed severe child abuse, DCS was relieved of making reasonable efforts toward reunification with Mother. Tenn. Code Ann. § 37-1-166(g)(4)(A) (providing that DCS may be relieved of its duty to make reasonable efforts after a court finds "aggravating circumstances," including "severe child abuse"). The trial court entered its order relieving DCS of making reasonable efforts on July 18, 2013.

App. Oct. 13, 2008) (citing ***In re T.S.***, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)).  The failure to remedy the conditions which led to the removal need not be willful.  ***In re T.S. & M.S.***, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*6 (Tenn. Ct. App. July 13, 2000) (citing ***State Dep't of Human Servs. v. Smith***, 785 S.W.2d 336, 338 (Tenn. 1990)).  "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified."  ***Id.***  The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child."  ***In re A.R.***, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting ***In re D.C.C.***, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

In this case, it is undisputed that the child has been removed from Mother's home for over six months.  The now-two-year-old child has been living with Foster Parents since he was eleven months old.  The trial court found sufficient evidence to conclude that the conditions that led to the child's removal, most notably Mother's drug use, still persist and would, in all reasonable probability, subject the child to further abuse.  The trial court relied heavily on social media evidence that Mother maintained a relationship with Father, who pleaded guilty to drug charges, and that Mother's social media posts suggested some involvement with alcohol.  The evidence in the record does not preponderate against the trial court's findings that Mother has maintained a relationship with Father after the removal of the child and that Mother may be involved with alcohol.  However, we conclude that these facts fail to clearly and convincingly establish that the conditions that led to the child's removal, Mother's drug use, still persist.  *See **Jones***, 92 S.W.3d at 838 (noting that the facts, as found by the trial court, must support the ground for termination by clear and convincing proof).

In a similar case, ***In re C.M.C.***, this Court held that clear and convincing evidence was not established to show that the mother was still using illegal drugs even when her drug test came back positive.  ***In re C.M.C.***, No. E2005-00328-COA-R3-PT, 2005 WL 1827855 (Tenn. Ct. App. Aug. 3, 2005).  The Court reasoned that DCS had not met its heightened burden because other explanations to mother's positive drug test were plausible, such as the result being caused by mother's prescription medication.  Further, the reason the child was taken from mother in ***C.M.C.*** was alcohol, not illegal drug use.  The positive drug test, while possibly relevant for other inquiries in a termination case, was not, in itself, clear and convincing evidence to terminate parental rights on the ground of the persistence of conditions.  Further, testimony in that case showed that mother may have carried on an abusive relationship even though the court entered a no-contact order.  Because the witness

-11-

based his testimony solely on rumors that mother maintained the abusive relationship, this Court held that "[s]peculation based on rumor is not clear and convincing evidence." Accordingly, the *C.M.C.* Court reversed termination based on persistence of conditions.

Although we afford great credibility to the trial court's credibility determinations, *In re M.L.D.*, 182 S.W.3d 890, 897 (Tenn. Ct. App. 2005), we hold that, even if Mother's social media postings represent her current lifestyle, they do not rise to the level of proving the persistence of conditions by the standard of clear and convincing evidence. Several times, the trial court noted Mother's successes in attending therapy sessions and passing her drug tests. The record is clear that Mother has passed every subsequent drug test since removal of the child. As in *C.M.C.*, DCS has offered no evidence–other than social media postings–to establish that Mother's substance drug problem is ongoing. Further, Mother testified that she was not in a relationship with Father and that she had been sober since removal of the child. While the trial court found that Mother's own social media assertions belie her claim of complete sobriety, our review of the evidence in the record indicates that Mother's social media postings involve only alcohol, rather than drugs. In this case however, much like in *C.M.C.*, the reason the child was removed from Mother was drugs, not alcohol. *See* Tenn. Code Ann. § 36-1-113(g) (basing persistence of conditions on "[t]he conditions that led to the child's removal"). Indeed, the trial court's order removing the child from Mother's custody makes no mention of any alcohol abuse on the part of Mother. In addition, there are no requirements in the Alcohol and Drug Assessment for Mother to refrain from consuming alcohol; instead, she is simply directed to attend both therapeutic group sessions and Alcoholics Anonymous/Narcotics Anonymous meetings.[12] Nothing in the recommendation indicates that alcohol was either a specific concern or a condition that led to the child's removal. Nevertheless, testimony shows that Mother completed the requirements in her Alcohol and Drug Assessment, including attending Alcoholics Anonymous Meetings. Thus, while Mother's use of alcohol may be ongoing, and a proper consideration with regard to the best interest of the child, it is not an appropriate consideration with regard to the ground of persistence of conditions.

As previously discussed, evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). We conclude that the evidence presented fails to meet this high standard. Based upon

---

[12] The recommendations in the Alcohol and Drug Assessment did not distinguish between Alcoholics Anonymous and Narcotics Anonymous.

the sparse record before us, Mother's drug use appears to the be the only condition cited as the basis for removal of the child. The evidence in the record is simply insufficient to establish, by clear and convincing evidence, that the condition that led to the child's removal persists. Other than social media accounts indicating that Mother may maintain a relationship with someone involved in drugs, and her alleged continued use of alcohol, there is simply no evidence in the record that Mother has continued to abuse drugs. Mother's continued relationship with Father, while troubling to both the trial court and this Court, fails to establish the high burden of the clear and convincing evidence standard. Under these circumstances, we respectfully reverse the trial court's finding of persistence of conditions.

## V. Best Interest of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been

established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis. *White v. Moody*, 171 S.W.3d at 194.

-14-

***In re Audrey S.***, 182 S .W.3d 838, 878 (Tenn. Ct. App. 2005)**.**

Based on our review of the record, we agree with the trial court's determination that it is in the child's best interest to terminate Mother's parental rights. The trial court based its decision regarding best interest on a number of facts: (1) Mother's lack of stability; (2) the detrimental effect a change of caretakers would have on the child; (3) the fact that Mother committed severe child abuse against the child by exposing the child to drugs, yet continued to maintain a relationship with Father, who committed drug crimes after the child's removal, and continued to be involved with alcohol despite going to Alcoholics Anonymous meetings; (4) that no meaningful relationship had been established between Mother and the child, in contrast to the strong bond exhibited between the child and Foster Parents; and finally, (5) the fact that Mother has not made a significant change in circumstances to make it safe for the child to return to her custody.

We begin with the trial court's finding with regard to Mother's lack of stability. *See* Tenn. Code Ann. § 36-1-113(g)(5) (providing that the court shall consider "the effect a change of . . . physical environment . . . is likely to have on the child[]"); Tenn. Code Ann. § 36-1-113(i)(7) (providing that the court shall consider "[w]hether the physical environment of the parent's or guardian's home is healthy and safe"). The evidence in the record shows that Mother has moved multiple times during the pendency of these proceedings. Mother has lived in at least three—possibly four—places since the child was removed from her. Currently, Mother lives with an uncle. In contrast, it is undisputed that the Foster Parents have provided a safe and stable environment for the child since the child's placement there. We conclude that Mother's fluid living situation does not promote the child's best interest, our main concern under this inquiry. Here, nothing indicates that Mother's frequent moves are likely to stop if the child is returned to her, and there is little evidence in the record regarding the suitability of Mother's current home for a young child. In contrast, there is no dispute that Foster Parents have a safe, suitable, and stable home for the child. Thus, this factor favors a finding that termination is in the child's best interests.

The record also supports the trial court's finding that a change in caretakers would have a highly detrimental effect on the child's emotional, psychological, and medical condition. *See* Tenn. Code Ann. § 36-1-113(i)(5) (providing that the court shall consider "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition"). Foster Parents are able to provide for the child's needs. According to the testimony at trial, the child's expenses are typically more than the $250.00 stipend Foster Parents receive monthly, and Foster Parents testified they have supplemented this amount with out-of-pocket payments as well. The evidence shows that many of the child's expenses are related to the child's medical care. Thus, these expenses are necessary and the party that is best able to bear these expenses is an important consideration.

-15-

In a similar case, **Eason v. Bruce**, No. W2000-01326-COA-R3-CV, 2001 WL 502834 (Tenn. Ct. App. 2001), this Court affirmed the trial court's consideration of whether a parent could bear the medical and counseling expenses for the children in determining where the best interest of a child lies. *Id.* at \*4 ("[I]t's clear that [father's] financial situation has not moved to that level where he can comfortably afford to bear the expenses which [mother and her current husband] are bearing as it relates to these children and which obligation they will not have if custody was returned primarily to [father] . . . ."). The evidence shows that the child's monthly expenses amount to well over the $200.00 that Mother testified she could "stretch." Through no fault of her own, Mother is unable to provide the level of care to the child that Foster Parents are able to provide.

Further, the evidence shows that the child has a close and loving relationship with Foster Parents, who he knows as his parents. The child has lived with Foster Parents for over a year at a very formative stage in his life. In contrast, the child has begun calling Mother by her given name and often confuses Mother with one of Foster Parents' relatives. In this situation, removing the child from Foster Parents' home would likely have a detrimental effect on the child, not only medically, but also emotionally and psychologically. *See* Tenn. Code Ann. § 36-1-113(i)(5). The trial court found that this rings especially true in light of its findings of Mother's continued relationship with Father and her use of alcohol. Questions remain as to whether Mother has actually remained sober in the time her child has been in foster care and whether Mother has continued a relationship with Father, who is incarcerated for drugs. Conversely, at the time of trial, evidence shows that the child was doing well in Foster Parents' home. Testimony from several witnesses portrays him as a happy and well-cared-for child who enjoys his daily routine. The child's current placement offers him the stability he needs during his most impressionable years.

As previously discussed, the record also clearly indicates that the child was exposed to drugs while in Mother's care at her residence. *See* Tenn. Code Ann. § 36-1-113(i)(6) (providing that the court shall consider "[w]hether the parent . . . has shown . . . neglect toward the child"). The trial court found it especially troubling that Mother maintained an ongoing relationship with Father, even after he had been arrested on drug charges—the very issue that led to removal of the child from the parents' home. *See* Tenn. Code Ann. § 36-1-113(i)(7) (providing that the court shall consider "whether there is criminal activity in the home").

While Mother's social media postings indicate a relationship with Father, the trial court also found her social media posts about alcohol troubling. *See* Tenn. Code Ann. § 36-1-113(i)(7) (providing that the court shall consider "whether there is such use of alcohol . . . as may render the parent . . . consistently unable to care for the child in a safe and stable manner"). Although alcohol was not one of the conditions that caused removal of the child,

the trial court properly considered it when deciding what was in the child's best interests. Further, we conclude that Mother's involvement with alcohol, and her choice to post her involvement on social media does not promote the best interests of the child. Here, it appears that Mother chose to post pictures and comments on the internet regarding her involvement with Father and with alcohol, despite the fact that these posts could jeopardize her chances of reunifying with her child.

The record also supports the trial court's finding that Mother does not have a meaningful relationship with the child. We acknowledge that Mother was only provided with bi-weekly supervised visitation with the child, and that bi-weekly visitation was likely inadequate in promoting a stronger bond between Mother and child. *See* Tenn. Code Ann. § 36-1-113(i)(3) (providing that the court shall consider "whether the parent . . . has maintained regular visitation or other contact with the child"). However, Mother had adequate time to complete all of the recommendations from her counselor in her Alcohol and Drug Assessment, which would have allowed her to secure unsupervised visitation or visitation at her home. In the case at bar, Mother and the child appear to have a bond, but the bond that the child shares with Foster Parents is greater. *See* Tenn. Code Ann. § 36-1-113(i)(4) (providing that the court shall consider "whether a meaningful relationship has otherwise been established between the parent . . . and the child"). As previously discussed, the evidence supports the trial court's finding that the Foster Parents and the child have developed a strong bond. Testimony shows that they have lovingly cared for the child for over a year, have taken him to necessary medical appointments, and have ensured he made it safely to and from daycare. The child now views Foster Parents as his parents and their home as his home. In this situation, the evidence does not preponderate against the trial court's finding that Mother and the child have not developed a meaningful bond.

The trial court also found that Mother failed to make a lasting adjustment after DCS made reasonable efforts for such a duration of time that a lasting adjustment no longer appears possible. While Mother has refrained from using drugs for the duration of these proceedings, as shown by multiple negative drug tests, she has not found it as important to protect the image she broadcasts to others via social media, including that she is in a relationship with Father, who has been convicted for drug-related crimes. Despite her online image, Mother has attended substance abuse treatment and most of her other court-ordered treatment. As it relates to the best interest of the child, we conclude that the evidence relating to a "lasting adjustment" neither favors termination nor reunification.

Although not found by the trial court, we note that several factors do not favor termination in this case. First, it is undisputed that Mother was current on her child support payments pursuant to Tenn. Code Ann. § 36-1-113(i)(9). Mother also attended all scheduled visitation with the child. Finally, as previously discussed, Mother has remained drug-free

throughout the pendency of these proceedings. While these facts show that Mother has made some significant strides towards reunification, our focus is on what is best for the child, rather than what is best for the parent. ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); ***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Further, we do not need to find that every factor favors termination in order to determine that the termination of parental rights is in the child's best interest. ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Clearly, in this case, the record shows that the child has a far more meaningful relationship with Foster Parents, that Foster Parents are better able to provide for the child's medical needs, and that a change in caretakers would have a detrimental effect on the child. Additionally, the record shows that Mother has chosen to maintain a relationship with Father, at least on social media, despite the fact that their relationship may implicate her in continued drug use. Even taking Mother's testimony regarding her "fake life" as true, it shows that Mother was more interested in projecting a certain image on social media than avoiding any semblance of drug or alcohol abuse in furtherance of reuniting with her child. Under these circumstances, we conclude that clear and convincing evidence in the record supports the trial court's finding that termination of Mother's parental rights is in the best interest of the child.

## VI. Conclusion

For the foregoing reasons, we affirm the order of the trial court terminating Mother's parental rights. The case is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are assessed against the Appellant Mother, Morgan G. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE
